**PRICE BROTHERS COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 19523.

United States Court of Appeals,
Sixth Circuit.

Jan. 30, 1970.

Robert F. Young and Maxwell H. Stamper, Dayton, Ohio, for petitioner; Young & Alexander, Dayton, Ohio, on brief.

John L. A. de Passalacqua, Atty., N.L.R.B., Washington, D. C., for appellee; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William F. Wachter, Atty., N.L.R.B., Washington, D. C., on brief.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and WEINMAN,* District Judge.

PHILLIPS, Chief Judge.

This case is before the Court on the petition of Price Brothers Company of Dayton, Ohio, to review the decision of the National Labor Relations Board reported at 175 NLRB No. 47. The Board has cross-applied for enforcement.

The underlying facts are simple and undisputed. An employee of Price Brothers named Puckett worked in a large building in which adequate heat was always a problem during cold weather. On a drizzly day, when the temperature was about 50°, Puckett built a small wood fire in a five-gallon bucket on the concrete floor near the spot where he was working. The fire was some ten or fifteen feet from a drum containing a combustible material. His supervisor told him to put the fire out, but Puckett refused, stating "I'm no fireman." The supervisor extinguished the fire and told Puckett to go get a portable heater at the other end of the building. Puckett refused, saying, "Well, if you're going to use that tone of voice to me, slavery went

---

* Honorable Carl A. Weinman, Chief Judge, United States District Court for the Southern District of Ohio, sitting by designation.

out in 1865. If you're going to use that tone of voice, I wouldn't get it for anything."

About 15 to 20 minutes later when the supervisor returned to the area Puckett yelled at him and asked: "Are you going to give me any heat when I come into work Monday morning?" When the supervisor did not respond, Puckett asked him for a set of "grievance papers."

The supervisor reported the episode to three company officials, including the manager of labor relations. He was instructed to place Puckett on indefinite suspension. The supervisor then told Puckett to "punch out" and that he was "on an indefinite suspension not to last over five days during which the case was to be decided."

At a meeting of company officials held the following Monday a decision was made to discharge Puckett for insubordination because of his disobedience of a direct order. The Trial Examiner found that the discussion at this meeting centered around Puckett's act of disobedience and that the filing of the grievance was not mentioned at all.

The following letter of discharge thereupon was sent to Puckett:

"As you know, I placed you on indefinite suspension on the afternoon of November 17, 1967, with the advice that the decision concerning disposition of your case would be made within 5 work days.

"You were suspended because you refused, in the presence of a witness, to extinguish an open fire which you had started, which was a safety hazard.

"Your conduct in this matter is an inexcusable offense, namely insubordination, specifically refusal to obey a direct order, and you have left me no choice but to discharge you effective immediately."

The Company was charged with interference with, restraint and coercion of, employees in the exercise of their rights guaranteed in Sec. 7 of the Act and with discrimination in regard to the hire and tenure of Puckett. At the hearing before the Trial Examiner the General Counsel contended that Puckett was discharged because he had filed a grievance.

The Trial Examiner found that Puckett's refusal to obey the orders to put out the fire and get the portable heater, plus his "exaggerated demand" for heat the following Monday, were the motivating factors leading to his suspension and discharge; and that Puckett's threat to file a grievance about the heat did not motivate the discharge. He described Puckett's attitude as "pugnacious and aggressive." After hearing all the evidence and observing the demeanor of the witnesses, the Trial Examiner concluded that Puckett was suspended and discharged for insubordination. He recommended dismissal of the complaint.

With regard to the background of the labor relations between the Company and its employees, the Trial Examiner found that:

"Since 1953 the Union has been the certified bargaining representative of the production and maintenance employees. Labor contracts for 2- or 3-year periods were negotiated and became operative. Many grievances were filed by employees and acted upon by Respondent. There appears to have been amicable labor-management relations between the Respondent and the Union. Customarily, Respondent has released employees to engage in union activities; negotiation of contracts, etc."

In holding that the Company had not violated the Act by suspending and discharging Puckett, the Trial Examiner stated that his conclusion was buttressed by: (a) the fact that no antiunion animus on the part of the Company was shown by the evidence; (b) a long history of amicable and peaceful relations between the Union and Company; and (c) the fact that, in the past, many grievances have been filed by employees and handled by the Company without evidence of friction.

The Board disagreed with the decision of the Trial Examiner, holding that the

real reason for Puckett's discharge was his threatened invocation of the grievance procedure. The Company was ordered to reinstate Puckett with backpay. The order contains the usual cease and desist provisions and requirement of posting of notices.

In Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456, the Supreme Court said:

> "The committee reports also make it clear that the sponsors of the legislation thought the statutes gave significance to the findings of examiners. Thus, the Senate Committee responsible for the Administrative Procedure Act explained in its report that examiners' decisions 'would be of consequence, for example, to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing.' The House Report reflects the same attitude; and the Senate Committee Report on the Taft-Hartley Act likewise indicates regard for the responsibility devolving on the examiner.

> "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that *evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.* The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." (Emphasis supplied).

We conclude that the decision of the Board in the present case is not based upon substantial evidence on the record considered as a whole.

Enforcement denied.